Filed 5/16/12  P. v. Day CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B241842 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA067676) |
| v. | |
| ALAN DAY, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Joseph A. Brandolino, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant was convicted of two counts of residential burglary, and special allegations were found true. The sole issue presented on appeal is whether the trial court erred in sustaining objections to certain portions of the testimony defendant sought to elicit from his expert, Dr. Nadim Karim. Defendant contends the court abused its discretion in excluding some of Dr. Karim's testimony as to defendant's mental condition on the day the charged crimes took place, and that the exclusion of such evidence unduly prejudiced his ability to put on a defense. We find no error in the court's evidentiary rulings, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and appellant Alan Day was charged by information with two counts of first degree burglary (Pen. Code, § 459).[1] It was specially alleged as to count 1 that defendant used a dangerous weapon (a knife) in the commission of the burglary (§ 12022, subd. (b)(1)). It was further alleged defendant had suffered three prior felony convictions within the meaning of section 1203, subdivision (e)(4). The burglary charges arose from events that transpired on the afternoon of April 20, 2011, during which defendant entered two homes within the span of a couple of hours.

At around 1:00 o'clock in the afternoon, defendant entered the upstairs apartment of Rosa Medina Villareal, after having climbed a fence, avoiding the security gate, to jump up to the second story of the building. Defendant confronted Ms. Villareal in her home. He was holding a knife, which he pointed in her direction. She repeatedly yelled at him to leave, and after a few minutes defendant said, "I'm going to come back to you[,]" and left. Ms. Villareal was frightened and went to the police station to report the incident, and later identified defendant as the man who had entered her apartment with a knife.

A couple of hours later, Chad Jara returned to his home and found the front door unlocked. He had been the last one to leave and knew that all the doors and windows had been locked. When he stepped inside, he saw the back sliding glass door was "wide

---

[1]     All further undesignated section references are to the Penal Code.

2

open," and he could hear his dog barking inside the bathroom, even though he had left the dog in the backyard. Mr. Jara then saw defendant standing in the living room, shirtless, with what appeared to be blood on his stomach from several scratches. Startled, Mr. Jara asked defendant what he was doing, and he replied that he was "Richie's friend" and that Richie had lived there a few months ago. Mr. Jara's family had owned and lived in the house for years, so defendant's conduct made him start to "panic." Mr. Jara told defendant to leave and that he was calling 911. Mr. Jara repeated that defendant had to leave, and defendant eventually left the home.

Shortly thereafter, patrol officers responding to a radio dispatch to be on the lookout for a white, male burglary suspect, saw defendant walking down the street. Defendant, and the clothes he was wearing, matched the suspect's description the officers had been given, so the officers stopped to detain defendant. Defendant complied with the officers' instructions and was placed under arrest without incident. The officers found a camera, money, and at least 20 items of jewelry, along with a knife, in defendant's pockets. Mr. Jara subsequently identified the jewelry and the camera as property belonging to his family, and identified defendant as the man who had been in his home.

Defendant pled not guilty to both charges and denied the special allegations. The case proceeded to a jury trial in February 2012. Following presentation of the prosecution's case-in-chief, defendant called Dr. Nadim Karim to testify as an expert witness.

Dr. Karim attested to his education and experience in forensic psychology. He offered his opinions regarding defendant's mental health disorders, including schizoaffective disorder, and the general findings of the report he prepared following his examination of defendant. Defense counsel elicited testimony from Dr. Karim regarding the symptoms ordinarily associated with schizoaffective disorder such as hallucinations, as well as the exacerbating effect of the additional problems from which defendant suffered, including depression, seizure disorder and alcohol dependence. During the direct examination of Dr. Karim, the prosecution objected to some of the questions posed by defense counsel as calling for improper opinion testimony, or irrelevant, cumulative,

3

and speculative testimony. Some of these objections were sustained, and the preclusion of this testimony from Dr. Karim forms the basis of this appeal. We discuss the contested portions of Dr. Karim's testimony in greater detail in the discussion below.

The jury found defendant guilty on both counts of burglary, and found the personal use of a knife allegation true. The court sentenced defendant to state prison for a total term of seven years, four months. The court imposed various fines and awarded defendant 621 days of presentence custody credits. As to defendant's pending probation violations, the court found defendant in violation of his probation and imposed terms to run concurrently with the sentence imposed on the burglary counts.

This appeal followed.

## DISCUSSION

Defendant identifies 10 questions to which objections were sustained and, where relevant, testimony stricken. Defendant contends these 10 evidentiary rulings prejudicially impacted his ability to establish for the jury that he did not harbor the requisite mental state for burglary upon entering either of the victims' homes. "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10; accord, *People v. Vieira* (2005) 35 Cal.4th 264, 292.) We find no abuse of discretion here.

The admissibility of defendant's proffered expert testimony is governed principally by sections 28 and 29. Section 28, subdivision (a) provides: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is *admissible solely on the issue of whether or not the accused actually formed a required specific intent*, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (Italics added.)

4

Section 29 provides: "In the guilt phase of a criminal action, *any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states*, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (Italics added.)

Burglary requires proof the defendant entered the building with the specific intent to commit a theft or any felony. (See § 459; CALCRIM No. 1700; *People v. Fond* (1999) 71 Cal.App.4th 127, 132.) Defendant sought to defend against the two burglary charges on the theory he entered the two homes without the requisite specific intent to a commit a felony; that because of his mental disorders, including schizoaffective disorder causing hallucinations, he ended up in those two locations on the afternoon of April 20, 2011, without any specific intent or purpose, and may not even have known how he got to either location. Defendant argues the court's rulings sustaining objections to 10 specific questions constituted prejudicial error because those 10 questions sought only to elicit material expert testimony properly allowed by sections 28 and 29. We are not persuaded.

"Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but *do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state*." (*People v. Coddington* (2000) 23 Cal.4th 529, 582, italics added, fns. omitted (*Coddington*), overruled on other grounds as stated in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Defendant, relying heavily on *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*), correctly argues the law does not require a mental health expert to be limited to opinions stated solely in the abstract. *Cortes* explained that section 29 "presupposes that

5

the expert will testify about '[*the*] *defendant's* mental illness, mental disorder, or mental defect' (§ 29, italics added) and not only about the behavior of some 'general person' in the 'population at large.'" (*Id*. at p. 909.) *Cortes* concluded it was error for the trial court there to have precluded the defense expert from attesting to the defendant's mental health diagnoses, the nature of those specific mental health conditions and the related symptoms, as well as the connection between his conditions and his conduct. "The trial court abused its discretion in refusing to permit [the expert] to testify about defendant's particular diagnoses and mental condition and their effect on him at the time of the offense, and in limiting [the expert's] testimony to diagnoses or mental conditions in the abstract and their effects on the general person in the population at large." (*Ibid*.)

In contrast, the trial court here did not improperly preclude Dr. Karim from testifying about defendant's mental health diagnoses and the correlating impact on his behavior. Consistent with the parameters set forth in *Coddington*, Dr. Karim testified about defendant's mental health issues, his specific diagnoses, and how they might have affected him at the time of the burglaries. He was not limited to testifying only "in the abstract" as the expert was in *Cortes*. (*Cortes*, *supra*, 192 Cal.App.4th at p. 909.) While the court tried to guide defense counsel several times after sustaining an objection by suggesting that counsel propose a hypothetical or "get to the point," Dr. Karim was allowed to testify in significant detail about defendant's actual mental health issues and how they were related to his conduct on April 20, 2011.

Indeed, Dr. Karim was allowed to testify at length about defendant's multiple mental health disorders that he has suffered for at least 15 years. Dr. Karim stated he reviewed medical records related to defendant dating back to 2008, as well as the medical records of defendant's hospitalization in the week preceding his arrest, and the police reports of the two incidents. Dr. Karim interviewed defendant on September 9, 2011. He attested to the significance of his finding that defendant continued to suffer from psychotic symptoms, including hallucinations, despite being under treatment and on medication.

6

Dr. Karim explained the conclusions of his report, including his diagnosis of defendant as suffering from schizoaffective disorder, with alcohol dependence, depressive personality disorder and a history of seizures. He explained that his diagnoses were consistent with the diagnoses of other physicians contained in defendant's medical history, which included multiple hospitalizations over the 15-year time span. He provided general background regarding the nature of schizoaffective disorder, mood and personality disorders, and the related symptomatology. Of particular note, Dr. Karim explained that individuals with schizoaffective disorder generally experience various psychotic symptoms, including hallucinations, delusions, lack of self-awareness, "thought broadcasting," perseverating (repetition of word or gesture, often in response to perceived internal stimuli), and disorganized thinking.

Dr. Karim also attested to defendant's hospitalization during the time period just before his arrest. He explained that defendant was placed on an involuntary psychiatric hold pursuant to Welfare & Institutions Code section 5150 on April 14, 2011, at Huntington Memorial Hospital due to depressive, suicidal and delusional behavior. Dr. Karim further testified that defendant was transferred from Huntington Memorial Hospital to Aurora Charter Oak Hospital, where he obtained in-patient treatment until his discharge on April 19, 2011, and that, notwithstanding his treatment in a hospital setting, defendant continued to suffer from hallucinations at the time of his discharge.

Dr. Karim specifically opined that, based on the record of his conduct, defendant was likely suffering from hallucinations on April 20, 2011, and explained that someone suffering from schizoaffective disorder can often find themselves in a location and not understand how they got there, or believe they are actually somewhere else.

Dr. Karim also answered extensive hypothetical questions based on the facts of the case. Specifically, Dr. Karim was asked: "Could schizoaffective disorder prevent a schizoaffective man, in this hypothetical, who enters a stranger's home and removes property—could it prevent a man from forming the intent to steal or to commit a felony inside the home?" Dr. Karim responded yes, explaining that individuals suffering from

7

the disorder often have impaired judgment, lack of awareness and orientation to reality, and often "find themselves in a place without realizing how they had gotten there."

In response to another lengthy hypothetical about whether a man suffering from schizoaffective disorder would be likely to enter two different residences, not his own, without any specific intent in mind, Dr. Karim responded yes, explaining, in relevant part, that "the schizoaffective nature of his clinical presentation suggests that he is experiencing a fluid psychotic process whereby his decision[making] is impaired, his judgment is impaired, his awareness to his surroundings and his behavior is impaired, and that he may be continuing to respond to internal stimuli, including either[]or both auditory and/or visual hallucinations."

Notwithstanding the extensive expert testimony offered by Dr. Karim in support of the defense theory, defendant contends the court erred in sustaining objections to the 10 disputed questions. Of the 10 questions identified by defendant, three sought general information regarding defendant's mental health history and status, two questions related to the nature of defendant's hallucinations in the days preceding his arrest, and five questions focused on potential symptoms defendant may have suffered from on the day of his arrest.

The three general background and status questions were: "How many psychiatric hospitalizations has [defendant] had?"; "What was [defendant's] relationship with his wife at the time of his admission to Huntington Memorial Hospital?"; and "Was . . . a treatment plan . . . [¶] . . . [¶] . . . ever implemented" upon defendant's discharge on April 19, 2011? The court sustained relevancy objections to these three questions. Defense counsel made no effort to rephrase the questions or to make an offer of proof to the court about how such information was relevant to Dr. Karim's opinions. Defendant has not shown any error in the court's rulings as to these three questions. Moreover, Dr. Karim did testify, at other points in his testimony, about defendant's numerous hospitalizations related to his psychiatric illnesses. Defendant has not shown what additional, relevant testimony could have been obtained had Dr. Karim been allowed to answer these three questions.

8

The disputed questions regarding defendant's history of hallucinations were just two among a number of questions on the subject generally, the great majority of which the court allowed Dr. Karim to answer. First, defense counsel asked Dr. Karim to explain what defendant's treatment records from April 16 and 18 indicated about the hallucinations defendant experienced on those dates. The prosecutor initially objected only on grounds of speculation, which the court overruled, but the prosecutor then asserted the testimony would be cumulative. The trial court sustained the objection on that ground. The record shows Dr. Karim had already testified in some detail about defendant having experienced both visual and auditory hallucinations on those dates and generally during the period of his hospitalization between April 14 and 19, 2011, just before his arrest. The court did not abuse its discretion in sustaining an objection that further testimony on that same point would have been cumulative.

Defense counsel asked a few more related questions, which Dr. Karim answered, and then returned to the subject of defendant's hallucinations on April 16 and April 18, 2011. "Just to be clear, what type of hallucinations was [defendant] complaining of experiencing on April 16th and 18th?" The prosecution objected: "Again, I would object on relevancy and cumulative." The court sustained the objections.

Counsel then rephrased the question slightly and inquired whether Dr. Karim had relied on the fact defendant had experienced hallucinations in the days immediately preceding his arrest on April 20, 2011. Dr. Karim confirmed that he had, explaining, "I had to look at the exacerbation of psychotic symptoms for an individual who is medicated and see whether or not that individual was continuing to experience psychotic symptoms." Defense counsel clarified: "This is not only medicated, but also in a hospital setting?" Dr. Karim answered yes and repeated that defendant had continued to experience visual hallucinations, including on April 16th and 18th, despite being hospitalized and undergoing treatment—a point Dr. Karim emphasized several times during his testimony as significant to his opinions concerning defendant and his conduct on April 20, 2011. The earlier ruling sustaining the objection, even assuming it had been

9

in error, was immaterial since the testimony was admitted once the question was rephrased.

The court subsequently allowed additional follow-up testimony on this same subject, over the prosecutor's objection. Defense counsel asked: "Now, we've discussed [defendant's] experiencing visual, auditory hallucinations, hallucinations as early as on April 15th, 16th, and 18th. [¶] And, in your opinion, considering this and your clinical interview with [defendant], anything else that you considered that you deem relevant in your opinion, is it likely that [defendant] was experiencing hallucinations, either visual or auditory, on April 20th, 2011?" The prosecutor objected on the grounds of improper opinion and speculation. The court overruled the objections. Dr. Karim then responded: "It's my opinion [defendant] was experiencing auditory hallucinations, possible visual hallucinations, on April 20th."

Dr. Karim was therefore allowed to express and extensively explain the bases for his opinion that defendant suffered from hallucinations on the day of the burglaries. No error has been demonstrated in the court's rulings on this issue.

The remaining five disputed questions all generally related to other symptoms defendant may have been suffering on April 20, 2011, that could have impacted his conduct on that date. After obtaining numerous opinions from Dr. Karim based on hypothetical questions, defense counsel asked if he considered whether defendant ended up "somewhere" while thinking he was "somewhere else" on April 20, 2011. The prosecution objected without stating a specific ground, and the court sustained the objection. Defense counsel then asked essentially the same question, rephrasing slightly to ask if Dr. Karim had considered whether defendant suffered from disorganized thinking on that date. The court sustained another unspecified objection from the prosecution, stating "you can ask the hypothetical."

Defense counsel proceeded to ask a number of detailed hypothetical questions based directly on the evidence of defendant's conduct on April 20th and his documented symptoms, and obtained permissible opinions from Dr. Karim supporting the defense

10

theory that defendant had not harbored any specific intent to commit any felony upon entering either of the victims' homes.

Defense counsel then returned to the same form of question to which the court previously sustained objections, asking Dr. Karim if he considered whether defendant "was experiencing internal stimuli the day he was arrested," and Dr. Karim responded that he had. The prosecution objected on the grounds of relevance and speculation, and moved to have Dr. Karim's answer stricken. The court sustained the objections and ordered the answer stricken. Defense counsel then asked identical questions with respect to "emotional fragility" and "paranoid ideations." The prosecution raised the same objections and the court sustained them. Defense counsel made no effort to rephrase these questions or ask hypothetical questions to elicit the desired testimony, and completed his direct examination.

The defense asked improper questions in an attempt to obtain an opinion from Dr. Karim that defendant had in fact acted without thinking when he entered the victims' respective homes, and the court properly excluded the testimony. An expert may not "evade section 29 by offering the opinion that the defendant at the time he acted had a state of mind which is the opposite of, and necessarily negates, the existence of the required mental state." (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 [trial court properly allowed extensive testimony regarding the defendant's mental health history and how it impacted his behavior, and properly excluded opinion that defendant had acted impulsively in firing gun].)

The questions, as phrased, called for a conclusion by Dr. Karim as to defendant's actual mental state upon entering the victims' respective homes, or at least a conclusion that he was acting with the absence of the required specific intent, neither of which would be proper under section 29. Defense counsel did not attempt to rephrase the questions so as to be more appropriately focused on seeking a permissible opinion from Dr. Karim. "[S]ections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, *as long as the*

11

*expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged*." (*Cortes*, *supra*, 192 Cal.App.4th at p. 908.) These five disputed questions "crossed the line" and the expert's responses were properly precluded.

Defendant has not demonstrated the trial court abused its discretion by limiting Dr. Karim's testimony. Rather, the record reflects the trial court struck an appropriate balance in allowing admissible expert testimony that was tailored to the issues in the case, while excluding inadmissible opinion testimony that would have invaded the factfinding province of the jury, in violation of section 29, on the question of whether defendant actually harbored the requisite mental state at the time of the charged offenses. (*Coddington*, *supra*, 23 Cal.4th at p. 582.)

## DISPOSITION

The judgment of conviction is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


GRIMES, J.

WE CONCUR:



RUBIN, ACTING P. J.



FLIER, J.

12